UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

———————————————————     )
                                                         )
UNITED STATES OF AMERICA           )
                                                         )     Case No. 1:23-cr-00089-SE-TSM-1
v.                                                     )
                                                         )
EVAN GADAROWSKI                        )
———————————————————     )

## SENTENCING MEMORANDUM AND MOTION FOR *BOOKER* VARIANCE

NOW COMES the Defendant, Evan Gadarowski, by and through his counsel, Wilson, Bush & Keefe, P.C. ("the Defendant"), and hereby files the present sentencing memorandum and motion for *Booker* variance, respectfully requesting that the Court impose a sentence of 120 months (ten years) in the custody of the Bureau of Prisons.  This sentencing is about a young man with no criminal history who engaged in deplorable conduct due to his mental health.  He is not a bad person who did a bad thing, he is a good person with a serious mental health problem. The sentence here should reflect that.  In support thereof, the Defendant submits the following:

This motion is predicated upon the Court's Standing Order on Procedure for Requesting Deviation from Sentencing Guidelines; 18 U.S.C. § 3553(a); United States v. Booker, 543 U.S. 220 (2005); Rita v. United States, 551 U.S. 338 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Gall v. United States, 552 U.S. 38 (2007); United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), *cert. denied*, 127 S.Ct. 928 (2007); and their progeny.

## I. Introduction

On October 11, 2023, Evan Gadarowski ("Evan") the government charged Evan by an Information with Distribution of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) and Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).  This investigation began in March 2021 when law enforcement first approached Evan,

and he gave them a voluntary statement.  Law enforcement then waited more than a year to bring forward criminal action.

Pursuant to continuous discussions with the government, on October 23, 2023, Evan waived indictment and pled guilty to the Information.  The Court released him on pretrial conditions that included a curfew and location monitoring. The Court then scheduled this matter for sentencing.

On December 8, 2023, this Court issued an arrest warrant pursuant to a violation report filed by United States Probation.  Law enforcement arrested Evan on December 12, 2023.  He appeared for a bail revocation hearing the following day, and Evan stipulated to detention.  As to the nature of the violation, Evan failed to report home by his 8:00 curfew.  Although he told his supervising officer he was at the grocery store, he was at a local library until approximately 8:30 p.m.  Probation located a laptop computer with internet access in his possession.  Evan was at the library using the library's internet service in order to bid on the purchase/sale or trade of baseball cards.

Evan has been incarcerated since that day.  He has used his incarceration to reflect not only upon the acts with which he is charged here, but also what led to those acts.  This has involved an incredible amount of self-reflection and honest consideration of what brought him before this Court.  Evan has been in personal mental health counseling with a psychologist since 2016.  He temporarily stopped that counseling due to the Covid-19 pandemic, but he resumed it again after law enforcement approached him about this matter.  He has also been in extensive psycho-sexual counseling since law enforcement approached him in this matter.  While incarcerated, Evan has continued both his personal counseling as well his psycho-sexual treatment *via* tele-health.  He has also has completed 107 self-led educational courses during his

incarceration, and he has been trusted with a job in the manufacturing section of the jail.  Of note, Evan has also been assaulted at the jail while incarcerated.

## II.      Guideline Analysis

Evan has accepted responsibility for the subject crimes in this matter.  In substance, he agrees with the government's statement of offense conduct.[1]  More importantly, Evan recognizes the harm he has caused by his actions.  As he reflects back on that time in his life, it is difficult for him to conceive that he was capable of such conduct.  He does not and will not seek to excuse his actions, but he would like the Court to know that he is humiliated not just by his actions but as well by the thought patterns that caused him to engage in this conduct.  He recognizes that he has a severe mental/emotional illness that caused him to commit these crimes.  Again, Evan does not seek to excuse his actions, but he feels that the Court, the government, and especially the victims deserve an explanation for how he could do such things.

The Presentence Report ("PSR") correctly captures the technical guideline calculation in this case.  The base offense level is 32.  There is a two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(1)(B) due to age of at least one of the victims.  As well, there is another two-level enhance pursuant to U.S.S.G. § 2G2.1(b)(2)(A) due to the offense involving a sexual act.  A further two-level enhancement is applied pursuant to U.S.S.G. § 2G2.1(b)(3) because he distributed sexually explicit materials.  Finally, there is yet another two-level enhancement pursuant to U.S.S.G. § 2G2.1(b)(6)(B) because he used an interactive computer service to induce a minor to engage in sexually explicit conduct.  These leaves a total offense level of 40.

---

[1] To the extent the Presentence Report suggests the Court should consider or rely upon factual information beyond that contained in the Offense Conduct section of the Plea Agreement, Evan objects to such information.  A review of the technical material in discovery revealed that much of the contact believed to be conducted by Evan during the investigation of this case geo-located to different parts of the world not in any close proximity to where Evan was located.

The PSR correctly analyzes the multiple account adjustment.  Pursuant to this, there are an additional two points added to the base offense level, bringing that offense level to 42.

Evan has accepted responsibility in this matter, and thus he is entitled to a three-level reduction in his base offense level.  This leaves a total offense level ("TOL") of 39.

Evan agrees that he has zero criminal history points, and thus has a criminal history category ("CHC") of I.

With a CHC of I, this places him in a range of 262 to 327 months in the U.S.S.G. Sentencing Table.  The maximum term of imprisonment in count 1 is 20 years, and the maximum term of imprisonment on count 2 is 10 years.  Thus, in order to achieve a 'guideline' sentence in this case, the Court would have to engage in the unusual action of impose consecutive sentences.

As well, for the reasons that follow, Evan requests that this Court vary downward to the requested sentence to the extent it does not depart from the stated guideline calculation.

**III.    Motion for <u>Booker</u> Variance**

**A.    Legal Basis**

Evan moves for a variance from the TOL found in the PSR.  Such a variance may be premised on the following:  the Court's <u>Standing Order on Procedure for Requesting Deviation from Sentencing Guidelines</u>; 18 U.S.C. § 3553(a); <u>United States v. Booker</u>, 543 U.S. 220 (2005) (making the U.S.S.G. advisory only)[2]; <u>Rita v. United States</u>, 551 U.S. 338, 127 S.Ct. 2456

---

[2] The sentencing factors which <u>Booker</u> requires the district courts to consider include:
  (1)  the nature and circumstances of the offense and the history and characteristics of the defendant [§3553(a)(1)];
  (2)  the need for the sentence imposed-
      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) to afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes by the defendant; and

(2007); <u>Kimbrough v. United States</u>, 522 U.S. 85, 128 S.Ct. 558 (2007); <u>Gall v. United States</u>,

522 U.S. 38, 128 S.Ct. 586 (2007); <u>United States v. Jimenez-Beltre</u>, 440 F.3d 514 (1st Cir. 2006),

*cert. denied* 127 S.Ct. 928 (2007).

In light of the fact that the U.S.S.G. are now only advisory, this Court may now consider

those mitigating factors that the advisory guidelines prohibit: e.g., poverty, racial discrimination

and humiliation, drug abuse and addiction, dysfunctional family background, lack of guidance as

a youth, etc. <u>See</u> <u>United States v. Ranum</u>, 353 F.Supp.2d 984 (E.D. Wisc. 2005) ("The

guidelines' prohibition of considering these factors cannot be squared with the Section

3553(a)(1) requirement that the court evaluate the "history and characteristics" of the

defendant.'"); <u>United States v. Myers</u>, 353 F.Supp.2d 1026 ((S.D. Iowa, 2005) ("The guidelines

prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that

the court evaluate the "history and characteristics" of the defendant....Thus, in cases in which a

defendant's history and character are positive, consideration of all of the § 3553(a) factors might

call for a sentence outside the guideline range."); <u>United States v. Jaber</u>, 362 F.Supp.2d 365 (D.

Mass. 2005) ("*Booker* plainly allows courts to look carefully at those factors and to determine to

what degree they are relevant to individual cases").

As well, Congress had directed that the district court "shall impose a sentence **sufficient,**

***but not greater than necessary***, to comply with [the purposes of sentencing]" (emphasis added).

18 U.S.C. § 3553(a) (emphasis added). This is the "primary directive" of the sentencing statute.

---

(D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [§3553(a)(2)];
(3) the kinds of sentences available [§3553(a)(3)];
(4) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range [§3553(a)(4) and (5)];
(5) the need to avoid unwarranted sentencing disparity among defendants with similar records that have been found guilty of similar conduct [§3553(a)(6)]; and
(6) the need to provide restitution to any victims of the offense(s) [§3553(a)(7)].

Ranum, 353 F.Supp. 2d at 986; United States v. Pirani, 406 F.3d 543, 564 (8th Cir. 2005) (Bye, J., dissenting) ("factors previously deemed ordinarily irrelevant to sentencing under Chapter 5H of the guidelines such as the defendant's age, education and vocational skills, mental and emotional conditions, physical condition, employment record, family ties and responsibilities, and charitable service are now valid considerations for a court in imposing a sentence").

Arguably, no special weight is to be given to the advisory guidelines or other factors mentioned in the statute. See United States v. Okai, 2005 WL 2042301 (D. Neb. August 22, 2005) ("The Guidelines range is thus one of many factors for the sentencing court to consider, and although the court is not bound by the Guidelines, it must consult them and take them into account when sentencing."); Pirani, 406 F.3d at 564 ("in addition to consideration of the guideline range the court must give equal consideration to sentencing factors such as just punishment, deterrence, incapacitation, rehabilitation, and the need for the sentence to reflect the nature and circumstances of the offense and the history and characteristics of the defendant"); Jaber, 362 F.Supp.2d at 365 (advisory does not mean "slavish application of the Guidelines under the guise of fair "consideration"); United States v. Moreland 366 F.Supp.2d 416 (S.D.W.Va. 2005) ("while I respect the advice of the Guidelines and give it serious consideration, I do not view that advice as carrying greater weight than any of the other § 3553(a) factors"); United States v. Biheiri 356 F.Supp.2d 589 (E.D.Va. 2005) ("no individual factor is singled out as having greater weight; instead, the richness of factual diversity in cases calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances.").

**B.     Nature and Circumstances of the Offense, History and Characteristics of the Defendant, and Defendant's Family Ties and Responsibilities**

Evan understands he engaged in incredibly harmful conduct.  He has spent much of his

time while in counseling and also while incarcerated thinking about the harm he has caused the victims in this case.  He 'catfished' approximately a dozen victims, posing as a teenage girl and then soliciting sexual images and videos from them.  He did sometimes engage in the coercive actions described in the Plea Agreement order to obtain these materials.  He then sent some of the images and videos, sometimes selling them, to other individuals.  Evan agrees that the PSR depicts his conduct accurately with the exceptions noted in counsel's response to the PSR.

However, counsel notes a constant set of themes that pervade the letters in support of Evan.  Most of them come from older family members who have known Evan since his birth. Aside from the description of his good qualities, everyone in his family recognized from a young age that Evan was different.  He could not socialize at school – unable to make or keep friends, unable to comport his behavior at an age-appropriate level in order to be part of his peers' social and educational group. As he grew up, family saw a boy who became more isolated and introverted because of his condition.  He had no real friends, was not invited to birthday parties, and did not engage in school or social functions because he was not invited.

The death of Evan's father was often seen as the cause of this pattern, but as Evan grew older doctors recognized in him various mental health/bio-medical issues.  Doctors described it as ADHD and questioned whether he had autism or Asperger's Syndrome.  Family saw Evan become unreasonably angry at time, and he found comfort in actions in which he could engage on his own.  This often involved the internet and all of the dark parts it has to offer.  Even to his last days before incarceration, Evan risked his freedom to engaged in the trading of baseball cards on the internet.  Not only does Dr. Williams opine, but everyone in his family questions is confident that Evan would not have engaged in this conduct here if he did not suffer from these issues.

1.      <u>Personal History, Family Ties, Characteristics</u>

Evan is 29 years old, but he is much less mature than his age.  Evan's birth-father, Mark Gadarowski, died from cancer when Evan was five years old.  His father became sick with cancer when Evan was only two years old, and Evan's earliest memories are of his father's physical decline and eventual passing while he was a small child.  His mother met Michael Joyal, and married him some years later.  Michael has been a father to Evan during his life, but the death of Evan's biological father had been an underlying and constant source emotional turmoil through Evan's youth.

Evan grew up in a middle-class home in Dover, New Hampshire.  He was close with his family while growing up, and he lived in a healthy home environment.  Despite appearing to be a normal child with a good upbringing, Evan was socially isolated as a child and teen.

Evan graduated from St. Thomas Aquinas High School in Dover in 2012.  His parents thought that a small, religion-based high school might help Evan socially grow.  He then went to the University of New Hampshire, studying Marine Biology, for one year.  Evan was not socially mature enough for college at that time, so he withdrew after completing his first year.  However, he renewed his education at Middlesex Community College where he completed two years of study in liberal arts.

Evan started working in 2013 as a vet tech at the Cocheco Valley Humane Society in Dover.  In 2014, he started working as a security officer for Securitas Security Services.  In 2017 he obtained a position at Target working in the grocery section of the store.  In 2018 he worked for Cole Haan in a warehouse putting together online orders.  For a short time in the summer of 2019, he was a window clerk at the Somersworth post office.  Right after that he began working as an inventory specialist at Stonewall Kitchen in Dover.  He held this job for nearly four years.

However, when news of his prosecution in this case became known amongst his co-workers, he had to leave this job.

Relationships have always been difficult for Evan, and they continued to be so through the time of his incarceration. His mother confirmed that he always had difficulty forming friendships throughout his life, especially in school and including college. She also confirmed that he has an addictive personality in activities that isolate him in the real world. These include an addiction to online gambling, electronic gaming, and interest and trading in baseball cards online. She suspected he had autism or Asperger syndrome due his lack of ability to socialize, his temper, and his impulsivity. Knowing him as well as anyone, she underscored that although he may now be 29 years old, he has the emotional and mental maturity of a teenager.

Evan also suffers from a medical condition which causes the death of bone tissue in his hip due to a lack of blood supply to that part of his body. He has had surgery for this condition which alleviated the pain he was suffering, but he will eventually have to have his hip replaced. A recent MRI suggests he will need surgery in the near future. Evan feels pain in his hip every day, even while in bed, that makes regular activities difficult and painful.

Evan believes from his own life experience that he suffers from ADHD. A doctor prescribed him Ritalin when he was 10 years old, which confirms his belief. He took this for four years until switching to Adderall. He stopped the Adderall after a month because of its side effects. Evan took no medication for many years after that. During the pendency of this case, Evan treated with a doctor who prescribed him Abilify and Effexor to treat his ADHD symptoms.

As well, since law enforcement first approached him in this matter back in March of 2021, Evan has been treating with Leo Keating for psycho-sexual treatment ad Dan Williams for

general counseling.  He sees both on a bi-weekly basis, and he continued his mental health treatment via tele-health while incarcerated.

Dr. Williams first began treating with Evan in 2016 when Evan was 22 years old.  <u>See</u> Exhibit A.  Evan presented with anxiety and smaller explosive anger episodes.  Dr. Williams diagnosed him with Adjustment Disorder with an anxious mood.  Dr. Williams confirms that Evan suffers from ADHD.  Dr. Williams also recognized Evan's emotional immaturity, pointing out that he struggled academically as well as socially, especially with the opposite sex.

Although Dr. Williams did not conduct a formal psychological evaluation of Evan, he is familiar with an evaluation done by a colleague in his practice.  He endorses that evaluation, and he offers his own thoughts on Evan and this matter based upon his clinical education and experience.  He initially notes that Evan's serious life difficulties are not an excuse for his actions here, but he recognizes Evan's diagnosis of Adult Antisocial Behavior.  However, he believes that Evan also suffers from an impulse-control disorder that led to his behavior in this case.  Dr. Williams notes several behavior patterns in Evan – his cessation of the activity when confronted by police, his admission to it, his admission to his then-girlfriend about it, all of which do not reflect anti-social behavior.  Evan's anxiety over face-to-face encounters with members of the opposite sex, coupled with his being much happier in life with a 'real' girlfriend, speak against a pedophilic sexual orientation.  The doctor noted that Evan's arrest for violating his bail over baseball cards reflects his impulse control disorder.

Evan has also been treating with Dr. Leo Keating since April 2021.  Leo has been working with sex offenders for 25 years.  Dr. Keating's report is attached hereto at Exhibit B. He conducted a comprehensive forensic evaluation of Evan, and he concluded that Evan was not generally sexually deviant but most notably had an undiagnosed psychiatric condition, autism

spectrum disorder.  Dr. Keating found that Evan's behaviors on the internet were motivated by poor social skills and lack of self-esteem that resulted from his neurodevelopmental disorder – Autism.

Evan met with Dr. Keating on a weekly basis for a year to gain an understanding of his deviant sexual cycle and specific techniques to address deviant thoughts and urges.  After the first year, Evan switched to bi-weekly counseling with Dr. Keating even while incarcerated. Evan has actively participated in his counseling, contributes in a meaningful manner, has a strong understanding of his sexual cycle, can identify the factors that contribute to that, and has developed an ability to have appropriate relationships with age-similar females.  Dr. Keating notes that Evan has made significant commitment to his treatment and that Evan represents a minimal respite to reinvent.

Almost all of the letters attached at Exhibit C from family and friends recognize a kind, caring, loving young man who has always struggled with being socially accepted, maturity, and how to process his impulses and emotions in a healthy way.  Every person in his family recognized, long before Evan committed the subject offenses here, that Evan matured at much slower rate than other children his age, he acted differently from them as he was more isolated and unable to be socially accepted, and as a result he engaged in activities that did not involve actual or real-world social interactions.  They love this person, but they have always seen in him a lonely boy who could not find a way to fit into this world.

2.     Nature and Circumstances of the Offense

Evan committed the acts with which he is charged.  However, he never intended to cause any actual harm.  As well, his actions derived from an alcohol-fueled form of political hysteria that he now renounces.  It is very likely that Evan's actions in this case, and the mindset that

allowed him commit these offenses, is connected to the instability and unusual influences of his childhood.

**IV.    Other 18 U.S.C. § 3553 Factors**

**A.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

A sentence of 120 months, ten years, one decade in prison reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offenses Evan committed.  The proposed sentence affords adequate deterrence to criminal conduct, and it protects the public from Evan committing any future crimes.  Evan had never been incarcerated prior to his arrest in this matter, and he has already experienced life-changing incarceration at this point having been physically assaulted due to the nature of the charges to which he pled guilty.

Evan will be on an extended period of supervised relief upon his release, will have to register as a sexual offender, and he will have to pay significant restitution.

**B.    The Kinds of Sentences Available, the Guidelines and Policy Statements Issued by the Sentencing Commission, Including the Advisory Guideline Range, and the Need to Avoid Unwarranted Sentencing Disparity Among Defendants with Similar Records That Have Been Found Guilty of Similar Conduct.**

The sentence recommended here is available and the variance Evan requests from the government's recommendation takes into account all of the 18 U.S.C. § 3553(a) factors as well as the facts and circumstances of the offense and Evan.  The sentence does not represent a marked deviation from the range that similarly situated defendants typically face, and thus should not cause any significant sentencing disparity among those defendants.

Regarding unwarranted sentencing disparities, Evan asks this Court to consider the following matter and sentence when arriving at its decision in this case.

The Court (<u>Barbadoro</u>, J.) sentenced Ryan J. Vallee, 23, to 96 months.  Vallee pleaded guilty on Aug. 25, 2016, to a 31-count superseding indictment charging him with 13 counts of making interstate threats, one count of computer hacking to steal information, eight counts of computer hacking to extort, eight counts of aggravated identity theft and one count of cyberstalking.  On March 16, 2016, while Vallee was awaiting trial, he was re-arrested on new criminal charges and has remained in custody.

According to admissions made in connection with his plea and evidence presented at sentencing, from 2011 through March 2016, Vallee, using various aliases that included "Seth Williams" and "James McRow," engaged in a computer hacking and "sextortion" campaign designed to force dozens of teenaged victims – many of which he personally knew – to provide him with sexually explicit photographs of themselves and others.

Vallee employed a variety of techniques to force his victims to cede to his "sextortionate" demands.  For example, according to the plea agreement, he repeatedly hacked into and took control over the victims' online accounts, including their email, Facebook and Instagram accounts.  Once he had control of these accounts, Vallee locked the victims out of their own accounts and, in some cases, defaced the contents of the accounts, he admitted.  In at least one instance, Vallee hacked into a victim's Amazon.com account, which stored her payment information and shipping address, then ordered items of a sexual nature and had them shipped to the victim's home.  Vallee also admitted that in some instances, he obtained sexually explicit photos of the victims and their friends and distributed them to the victims, their friends and their family members.  With at least one victim, Vallee created a Facebook page using an account

13

name that was virtually identical to the victim's real Facebook account name, with one letter misspelled, he admitted.  He then posted sexually explicit photos of the victim on this fake Facebook page and issued "friend requests" to the victim, her friends and her family members, according to the plea agreement.

Vallee admitted that he repeatedly sent threatening electronic communications to his victims, usually by using spoofing or anonymizing text message services, in which he threatened his victims that unless they gave him sexually explicit photographs of themselves, he would continue with the above-described conduct.  According to the admissions in the plea agreement, when most of the victims refused to comply with Vallee's demands and begged him to leave them alone, Vallee responded with threats to inflict additional harm.

### C.      Other Mitigating Factors

There are a substantial mitigating factors that call for the sentence requested here.  This Court may now consider those mitigating factors that the advisory guidelines prohibit: e.g., poverty, racial discrimination and humiliation, drug abuse and addiction, dysfunctional family background, lack of guidance as a youth, etc. See United States v. Ranum, 353 F.Supp.2d 984 (E.D. Wisc. 2005), *et seq.* (infra).  Also, the Defendant here notes that many courts believe that the Sentencing Guidelines are generally too harsh.  See August 9, 2003 Speech of Justice Anthony Kennedy at the ABA Annual Meeting (available at

**http://www.abanews.org/kencomm/amkspeech03.html**) ("Our resources are misspent, our punishments too severe; our sentences too long... the sentencing guidelines are responsible in part for the increased terms.... [and they] should be revised downward."); Ranum, 353 F.Supp. 2d at 985 n.1 (quoting Justice Kennedy's statement that "our punishments [are] too severe, our sentences too long")**;** United States v. Antonakopoulos 399 F.3d 68, 81 (1st Cir. 2005) ("History

shows that the mandatory nature of the Guidelines has produced particular results which led trial judges to express that the sentences imposed were unjust, grossly unfair, or disproportionate to the crime committed, and the judges would otherwise have sentenced differently."); Montanye v. United States, 77 F.3d 226, 233 (8th Cir. 1996) (Bright, J., dissenting) ("By any ordinary measure outside the guidelines, I would think this sentence would be considered draconian, unnecessarily harsh and unreasonable."); United States v. Andruska, 964 F.2d 640, 646-47 (7th Cir. 1992) (Will, Senior Judge, concurring) ("the irrationality and draconian nature of the Guidelines sentencing process is again unhappily reflected in this case").

1.     This Is Evan's First Conviction and Incarceration

Prior to this matter, Evan had never been charged, let alone convicted, of any offense.  At this age, these factors reflect that the effects of incarceration and being a life-long federal felon will act as substantial punishment, and they will act as a specific and general deterrent.  Many courts across the nation have recognized this rationale as a reason or basis to apply a below-guideline sentence.  See United States v. Paul, 561 F.3d 970 (9th Cir. 2009) (where defendant convicted of embezzlement and guidelines 10-16 months, court's within guideline sentence of 15 months unreasonably high in part because Paul was a first-time offender with no criminal record whatsoever); United States v. Autery, 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of possession of child pornography and where guidelines 41-51 months, court's *sua sponte* variance to probation not unreasonable in part because defendant's first conviction and Crim. History Level I "did not fully account or his complete lack of criminal history" because defendant with minor criminal history still falls in category I);  United States v. Huckins, (10th Cir. 2008) 529 F.3d 1312 (where defendant convicted of possession of child pornography and guidelines 78-97 months, court's variance to 24 months proper in-part because this was

defendant's first conviction – rejecting government's argument that guidelines already considered this by placing defendant in criminal category I "although the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of I … this is a not a departure case, it is a variance case … and, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a)....  Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis."); see also Report of USSC (May 2004) "*Recidivism and the 'First Offender'*,"  ("The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points.  Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all."); United States v. Duane, 533 F.3d 441 (6th Cir. 2008) ("[T]he district court did not respond to Duane's first argument — that he deserved a more lenient sentence because he had zero criminal history points.  This was not a particularly strong argument given that Duane's criminal history category was taken into account in determining his Guidelines range.  But the argument was not completely frivolous.  Because Duane had zero points at age 57, he might plausibly argue that even category I — which applies when a defendant has zero or one criminal history point(s) — overstated his criminal history to some degree."); United States v .Cabrera, 567 F.Supp.2d 271 (D. Mass. 2008) (where defendant convicted of possession of drugs with intent to distribute and guidelines 70-78 months, court imposed sentence of 24 months in part because "concerns about recidivism (see 18 U.S.C. §

3553(a)(2)(c) compel a sentence still substantially" lower).  The Sentencing Commission's

report, Recidivism and the "First Offender" (May 2004), available at

http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf, suggests that individuals -- like

Abiola -- with zero criminal history points are less likely to recidivate than all other

offenders … even for offenders with only one criminal history point. Id. at 13.

      As well, Evan is a first-time offender, and any amount of prison time is more significant

to him as compared to someone who has previously been incarcerated.  United States v. Paul

2007 WL 2384234 (9th Cir. Aug. 17, 2007) (unpub.) (within guideline sentence of 16 months

(high end) for taking government money unreasonably high in part because Paul was "a first-

time offender with absolutely no criminal record whatsoever"); United States v. Baker, 445 F.3d

987 (7th Cir. 2006)  (in distribution of child pornography case, court affirms below-guideline

sentence of 78 months (guidelines called for 108) noting that "significant is the district court's

finding that a prison term would mean more to Mr. Baker than to a defendant who previously

had been imprisoned.  Consideration of this factor is consistent with§ 3553's directive that the

sentence reflects the need for "just punishment," id. § 3553(a)(2)(A), and "adequate deterrence,"

id. § 3553(a)(2)(B)"); United States v. Santoya, 493 F.Supp.2d 1075 (E.D. Wisc. 2007) (in

distribution of cocaine case where defendant was career offender, below-guideline sentence

appropriate because a lesser period of imprisonment necessary to deter a defendant who has not

previously been subject to lengthy incarceration and where "the sentencing commission has

acknowledged that when career offender status is based on relatively minor drug offenses, the

guidelines may create a sentence greater than necessary"); United States v. Willis, 479

F.Supp.2d 927 (E.D. Wis. 2007) (in drug case where guideline range was 120 months but

statutory maximum was 60 months, sentence of one year and one day sufficient in part because

sentence "sentence provided a substantial punishment for someone like defendant, who had never before been to jail and who engaged in no violence or dealing herself"); United States v. McGee, 479 F.Supp.2d 910 (E.D. Wisc. 2007) (in heroin distribution case where guideline range was 21-27 months because defender got mitigating role reduction and safety valve, sentence of one year and one day imposed because guideline range in part because defendant "had never before been to prison and 'generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to reoffend."); United States v. Cull, 446 F.Supp.2d 961 (E.D. Wisc. 2006) (in marijuana case where guidelines 10 to 14 months, though defendant "not entitled to departure under pre-Booker standards"  and where "nothing extraordinary about the case or the defendant," court imposed two months jail with four months home confinement as a condition of supervised release imposed because "Defendant had never been confined before, so [two months jail time] was sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances."); United States  v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously  subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

<div align="center">

2.     Post-offense rehabilitation.

</div>

Many courts have held that post-offense rehabilitation may be a basis to support sentencing below the applicable guideline range.  *See, e.g.,* United States v. Bradstreet, 207 F.3d 76, 78 (1st Cir. 2000) (affirming downward departure for post-sentencing rehabilitation); United States v. Sally, 116 F.3d 76, 80 (3rd Cir. 1997) (holding post-offense rehabilitation efforts may constitute a sufficient factor warranting downward departure provided that efforts are so

<div align="center">

18

</div>

exceptional as to remove the particular case from the heartland in which the acceptance of responsibility guideline was intended to apply); United States v. Chapman, 356 F.3d 843 (8th Cir. 2004) (holding that post-offense rehabilitation can warrant departure eve if defendant did not accept responsibility); United States v. Whitaker, 152 F.3d 1238, 1240-41 (10th Cir. 1998) (authorizing departure for post-offense drug rehabilitation, overruling prior circuit precedent).

Even before being arrested in this matter, Evan has successfully participated in significant an on-going mental health treatment as described for over two years to understand why he committed these offenses and how he can ensure that he never engages in behavior like this ever again.  Since being incarcerated at the jail, in addition to maintaining his counseling through tele-health, Evan participates in Bible study in a weekly basis and has been given a job in the manufacturing area of the jail.  He has also completed 107 online self-study courses.

3.   Evan Has Incredible Personal Support

Despite his actions, and their nature, many people support Evan because they know him as a good and honorable person.  Although the Court will read the many letters of support attached hereto, see Exhibit C, the Court will find below just some of things people who know Evan say about him:

- He was a sweet and loving person;
- He is gentle and kind;
- He is an environmentalist and animal-lover;
- He is a good, young man who does not process his thoughts and feelings correctly;
- He treats everyone nicely no matter what;
- He is always willing to help;

- He is caring and helpful;

- He is hardworking;

- He loves his family; and

- He is loved.

These are just some of the things that the people who know Evan as a person think and say about him.  They are a reflection of who he is as a person as opposed to what he did in this case.

    C.    **Conclusion**

    This Court should punish Evan.  He recognizes that by the nature of the Plea Agreement he signed.  What he did was horrible, and he inflicted real harm.  A decade in prison for this person, in these circumstances, is sufficient but not greater than necessary to meet all the 3553 factors.  Evan is not a bad person who did a bad thing.  It is easy for one to conceive that anyone who would do what Evan did here simply bad, but that is not the case.  Evan was and is ill.  He is a kind, gentle, helpful, and loving person who cares about animals and the environment.  He suffers from diagnosed conditions that have isolated him his entire life, and through a confluence of personal and situational circumstance, Evan found himself going down a very dark hole on the internet as he struggled with his own ability to engage in real-world relationships with members of the opposite sex.  The purpose of sentencing is to deter, both generally and specifically, and to rehabilitate.  A sentence of 120 months is both a specific and general deterrent.  However, a sentence greater than 120 months would likely snuff out the light of a man who could have a life after incarceration.

**V.      Request for Relief**

Wherefore, Evan Gadarowski, through counsel, respectfully requests that the Court grant the relief requested, specifically that the Court impose the following sentence:

a)      120 months, followed by a term of supervised release;; and

b)      The $100.00 special assessment fees.

Finally, the Defendant requests any such other relief as may be deemed just and equitable.

<div style="margin-left: 50%;">

Respectfully submitted,

Evan Gadarowski
By and through his counsel,

</div>

DATED:  April 26, 2024                    /s/Charles J. Keefe
                                          Charles J. Keefe (N.H. Bar No. 14209)
                                          Wilson, Bush & Keefe, P.C.
                                          378 Main Street
                                          Nashua, NH 03060
                                          (603) 595-0007
                                          keefe@wbdklaw.com

**<u>Certificate of Service</u>**

I, Charles J. Keefe, hereby certify that true copies of the above document were delivered to AUSA Kasey Weiland and the United States Probation Office.

<div style="margin-left: 50%;">

/s/Charles J. Keefe
Charles J. Keefe

</div>